## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ISHANTA SHOALS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 16-CV-220-RAW |
| (1) THE STATE OF OKLAHOMA, ex rel. | ) | |
| OKLAHOMA DEPARTMENT OF HUMAN | ) | |
| SERVICES, | ) | |
| (2) MICHAEL KINDRICK, an individual, | ) | |
| and, | ) | |
| (3) ZANE GRAY, an individual, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT
## BY DEFENDANTS ZANE GRAY AND MICHAEL KINDRICK

Anastasia S. Pederson (OBA #17118)
John E. Douglas (OBA #2447)
Assistant General Counsel
Department of Human Services
P.O. Box 25352
Oklahoma City, OK 73125-0352

Telephone:  (405) 521-3638
Facsimile:  (405) 521-6816

E-mail:  Stacy.Pederson@okdhs.org
E-mail:  John.Douglas@okdhs.org

*Attorneys for Defendants*
*Zane Gray and Michael Kindrick*

March 13, 2017

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................. iii

MOTION FOR SUMMARY JUDGMENT BRIEF IN SUPPORT
BY DEFENDANTS ZANE GRAY AND MICHAEL KINDRICK ........................... 1

Summary of the Case .................................................. 1

Statement of Facts Under LCvR56.1(b) ................................. 2

Standard of Summary Judgment ......................................... 9

Argument and Authorities ............................................ 10

    I.   Kindrick and Gray are entitled to summary judgement
        on Shoals' claim of First Amendment retaliation. ................... 10

        A.  Shoals cannot establish the fourth prong of the *Garcett/Pickering*
            test, that her speech regarding R.S. case was a substantial
            or motivating factor in the decision to terminate her employment. ........... 11

            1.  Shoals' alleged communications to OCA, OCCY, and OIG
                regarding safety decisions of R.S were not a motivating
                factor in her termination. ....................................... 12

            2.  Shoals alleged communications regarding alleged
                deletion of her case notes were not a motivating
                factor in her termination ....................................... 14

            3.  Shoals communications to the multidisciplinary team (MDT)
                regarding safety decisions of R.S were not a motivating
                factor in her termination ....................................... 14

            4.  Shoals communications with her direct supervisors
                regarding safety decisions of R.S. were not a motivating
                factor in her discharge. ....................................... 15

        B.  Shoals cannot establish the first prong of the
            *Garcett/Pickering* test because her speech regarding the
            R.S. case was pursuant to her official job duties ......................... 15

            1.  The Multidisciplinary Taskforce/Tea, (MDT) ..................... 16

2.  The Office of Client Advocacy (OCA)  .................................................. 17

3.  The Oklahoma Commission on Children and
    Youth (OCCY).......................................................................................... 18

4.  The Office of Inspector General (OIG)  ................................................. 19

5.  Shoals direct supervisors and chain of command .................................. 20

C.  Kindrick and Gray can establish the fifth prong of the
    *Garcetti/Pickering* test, the same action would have
    been taken against Shoals even in the absence of the
    protected speech.  ........................................................................................ 21

II.  Defendants Gray and Kindrick are entitled to qualified immunity
     because under the facts and circumstances of this case, extant
     case law at the time of the firing had not rendered it "beyond
     debate" that Plaintiff's firing was unlawful. ............................................... 22

CONCLUSION  ........................................................................................................ 24

CERTIFICATE OF SERVICE  ............................................................................... 25

## **TABLE OF AUTHORITIES**

**Page**

## **CASES**

### **Federal**

*Aldaba v. Pickens (Aldaba II)*, 844 F.3d 870, 877 (10th Cir. 2016)  ........................................... 22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) ................................. 10

*Brammer-Hoelter*, 492 F.3d 1192 (10th Cir.2007)  ................................................ 11, 20

*Casey v. West Las Vegas Independent School District, 473 F.3d 1323 (10th Cir. 2007)*  ..........20

*Connick v. Myers, 461 U.S. 138, 146-47, (1983)*  ........................................................ 10

*Couch v. Board of Trustees of Memorial Hosp. of Carbon County,*
    587 F.3d 1223 (10th Cir. 2009)  ....................................................... 10, 11, 21

*Dill v. City of Edmond, Okla.*, 155 F.3d 1193, 1201 (10th Cir. 1998)  ...................................... 10

*Garcetti v. Ceballos,* 547 U.S. 410, 417 (2006)  ....................... 10, 11, 15, 17, 18, 19, 21, 22, 23

*Green v. Bd. of Cnty. Comm'rs,* 472 F.3d 794, 801 (10th Cir. 2007)  ...................................... 16

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)  ....................................................... 24

*Holub v. Gdowski*, 802 F.3d 1149 (10th Cir. 2015)  ................................................... 24

*Lane v. Franks*, 134 S.Ct. 2369, 2381 (2014)  ................................................... 22, 23

*Malley v. Briggs*, 475 U.S. 335, 341 (1986)  ........................................................... 24

*Maestas v. Segura*, 416 F.3d 1182, 1187 (10th Cir. 2005)  ........................................... 15

*Meyers v. Eastern Oklahoma County Technology Center,*
776 F.3d 1201, 1206 (10th Cir. 2015)  ......................................................... 12, 13, 14

*Mpoy v. Rhee*, 758 F.3d 285 (11th Cir. 2014)  ...................................................... 24

*Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568, (1968)  .......................... 10, 11, 15, 19, 21, 22, 23

*Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)  ............................................... 9

*Seifert v. Unified Gov't of Wyandotte Co.*, 779 F.3d 1141 (10th Cir. 2015) ........................ 16, 23

*Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) .................................................................. 10

*Thomas v. City of Blanchard*, 549 F.3d 1317 (10th Cir. 2008) ............................................ 20, 21

*Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014) ...................................................... 14

*White v. Pauly*, 137 S.Ct. 548, 551 (2017) ......................................................................... 22, 23

**Page**

## STATUTES

### Federal

Fed. R. Civ. P. 56(c) ................................................................................................ 1

42 U.S.C. §1983 ..................................................................................................... 24

### State

10A O.S. § 1-9-102 ........................................................................................... 3, 16, 18

10A O.S. § 1-9-102(A.) ........................................................................................ 16, 18

10A O.S. § 1-9-102(B.) ............................................................................................. 16

10A O.S. § 1-9-102(B.)(4.) ....................................................................................... 18

10A O.S. §1-9-112 ............................................................................................... 17, 19

10A O.S. §1-9-112(A.)(3.)(c)(1)(b) .......................................................................... 17

10A O.S. § 1-9-122(A.)(3)(d.) .................................................................................. 17

10 O.S. § 601.3 ......................................................................................................... 19

10 O.S. § 601.6 ......................................................................................................... 19

**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT
BY DEFENDANTS ZANE GRAY AND MICHAEL KINDRICK**

Come now the Defendants, Zane Gray ("Gray") and Michael Kindrick ("Kindrick"), and respectfully move the Court for summary judgment in their favor pursuant to Fed. R. Civ. P. 56(c) for the reason that there is no genuine issue of material fact and they are entitled to judgment as a matter of law on the claim asserted against them in the Second Amended Complaint (Doc. #44).

**Summary of the Case**

Plaintiff, Ishanta Shoals ("Shoals"), alleges violations of her right of free speech under the First Amendment to the United States Constitution arising out of her employment and termination by Defendants, Kindrick and Gray and the Oklahoma Department of Human Services (DHS).  In her role as a child welfare worker, Shoals was assigned the case of R.S., a five year old child who told Shoals that he had been injured by his father.  Shoals contacted the on-call supervisor at the time, Westdyke, who in turn contacted the district director, Sanders, regarding safety issues concerning the child.  Sanders determined that there was not sufficient reason to remove the child from his home that evening, and the child was left with his parents.  Shoals alleges that she disagreed with the decision to leave R.S. in his home and that, as a result of that decision, R.S. received additional injuries at the hands of his father that night.

Shoals claims she conveyed information about the R.S. matter to the Multidisciplinary Team (MDT), the "Oklahoma Inspector General's Office", the Office of Client Advocacy (OCA), and the Oklahoma Commission on Children and Youth (OCCY).  Shoals claims that she was terminated by DHS based upon her speech to these groups.

Kindrick and Gray maintain that Shoals' speech to all four of these groups was within her job duties for DHS.  In addition, the reasons that Shoals was terminated are unrelated to the R.S.

1

case and unrelated to her speech regarding that case. Further, Defendants would have made the same decision to terminate Shoals in the absence of her speech regarding R.S. Finally, Kindrick and Gray are entitled to qualified immunity regarding Shoals' claims against them.

**Statement of Facts Under LCvR56.1(b)**

1.  Shoals became employed with the Oklahoma Department of Human Services ("DHS") and began working in July 2014 as a Child Welfare Specialist I. (Ex. 1, Depo. of Shoals, p. 176, ll. 1 - 22).

2.  Shoals' job duties included providing child welfare services to children and families and participating in child abuse/neglect investigations. Her job description states that it is a "typical function" for her position to coordinate activities with law enforcement entities. "Additional duties" included in Shoals' job description include "providing protective services and coordinating referrals to other units, agencies, service providers and the courts." Shoals' job description also states that working "with a multidisciplinary team" is a necessary skill or ability for her job. (Ex. 2, Job Description for Child Welfare Specialist, H23).

3.  On November 5, 2014, Shoals was assigned a new referral regarding R.S., a 5 year old child who had arrived at school with a black eye and advised his teachers that his father caused the injury. (Ex. 3, Aff. of Kindrick, ¶3; Ex. 1, Depo. of Shoals, p. 61, ll. 6 - 13). R.S. informed Shoals that he was afraid of his father and feared he would be physically assaulted for accusing his father and telling the truth. (Ex. 4, Aff. of Gray, ¶3; Ex. 1, Depo. of Shoals, p. 63, ll. 6 - 10).

4.  Shoals contacted the on-call supervisor, Christen Westdyke, who relayed the information to the District Director, Jeff Sanders. (Ex. 3, Aff. of Kindrick, ¶4; Ex. 1, Depo. of Shoals, p. 62, l. 22 through p. 63, l. 4). Sanders made the decision that there was insufficient information of an imminent safety risk to remove R.S. from his home, and he was left with his parents that

evening.  (Ex. 3, Aff. of Kindrick, ¶4; Ex. 1, Depo. of Shoals, p. 63, ll. 22 - 25).  R.S. received additional injuries that night resulting in DHS involvement and the child leaving the home on November 6, 2014.  (Ex. 4, Aff. of Gray, ¶14).

5.  On November 7, 2014, Shoals attended a Multidisciplinary Team (MDT) meeting regarding R.S. (Ex. 1, Depo. of Shoals, p. 77, l. 20 through p. 78, l. 1).  According to Shoals, members of the MDT were angry that DHS had not removed R.S. on Shoals' initial contact. (Ex. 1, Depo. of Shoals, p. 80, l. 23 through p. 81, l. 7).

6.  It is routine for a child protective services worker (CPS), such as Shoals, to participate in MDT meetings.  It is also part of the job duties of a CWS worker to attend MDT meetings. Child Protective Services workers are expected to attend the meeting if one of their cases in on the agenda.  (Ex. 1, depo of Shoals, p.79, ll. 1, through p. 80, l. 4).  It is even mentioned in Oklahoma Statutes at 10A O.S. §1-9-102 that a child protective services worker from DHS is considered to be a member of the MDT team.  (Ex. 2, CWS Job Description; Ex. 3, Aff. of Kindrick, ¶6; Ex. 4, Aff. of Gray, ¶16).

7.  On November 13, 2014, Jeff Sanders received an email requesting an update on what DHS had done with regard to the R.S. case because the case notes had not been updated in the DHS child welfare database (aka "KIDS" database).  (Ex. 5, Email from Tina Pendergraft on November 13, 2014).

8.  On November 14, 2014, Shoals entered case notes into the "contacts" section of the R.S. referral in the KIDS database regarding her November 5, 2014, encounter with R.S. and the instructions that she had received from Westdyke and Sanders.  Those notes are still in the KIDS database and they have not been deleted.  (Ex. 6, Screenshot of Case Notes entered on November 14, 2014; Ex. 3, Aff. of Kindrick at ¶7).

3

9. On December 16, 2014, Shoals attended a meeting with two CPS supervisors, Linda Mobbs and Jeana Heist, and Michael Kindrick's administrative assistant, Tammy Willyard. (Ex. 7, Aff. of Heist, ¶9; Ex. 1, Depo. of Shoals, p. 100, ll. 1 - 5).

10. On December 17, 2014, Heist told Kindrick that Shoals had been argumentative and disrespectful in their meeting on the previous day. (Ex. 8, Email from Heist to Kindrick on December 17, 2014.)

11. Michael Kindrick contacted Leanne Saunders, the Discipline Manager for DHS, to seek advice about Ms. Shoals. Kindrick told Saunders that Shoals had been rude and hostile during a meeting with Jeana Heist and Linda Mobbs. Kindrick also told Saunders that there had been difficulty with the Muskogee County jail because the jail didn't want to allow Shoals into their building to interview incarcerated DHS clients. Kindrick also told Saunders that Shoals was a probationary employee for DHS.[1] This information prompted Saunders to review Shoals' application for employment. (Ex. 3, Aff. of Kindrick, ¶¶10-11; Ex. 9, Aff. of Saunders, ¶¶2-3).

12. On December 18, 2014, Shoals attended a meeting with Kindrick. (Ex. 1, Depo. of Shoals, p. 116, ll. 7 - 20). In the meeting, Shoals was told her application was being reviewed. (Ex. 10, Meeting Notes by Willyard).

13. On December 22, 2014, at 8:50 am, Leanne Saunders sent an email to Kindrick requesting that he give her a call because "[y]ou have an employee who was dishonest on their application." (Ex. 11, Email chain dated December 22, 2014, between Kindrick, Gray, Saunders, Willyard, and McAdoo; Ex. 9, Aff. of Saunders, ¶6).

14. On December 22, 2014, at 8:59 am, Kindrick sent an email to Gray documenting the call he had with Leanne Saunders. (Ex. 11, Email chain dated December 22, 2014, between

---

[1] The Oklahoma Administrative Code provides "[t]he probationary appointment of any person may be terminated at any time during the probationary period without the right of appeal [74:840-4.13(D)]." OAC:260:25-11-32.

Kindrick, Gray, Saunders, Willyard, and McAdoo).  According to Kindrick, Saunders "looked into the [Shoals'] application and discovered she worked for another state agency and didn't check yes on her application that she had."  (Ex. 11, Email chain dated December 22, 2014, between Kindrick, Gray, Saunders, Willyard, and McAdoo). Consequently, Kindrick told Gray that Saunders "said we have to do a probationary discharge and that you and I can determine when."  (Ex. 11, Email chain dated December 22, 2014, between Kindrick, Gray, Saunders, Willyard, and McAdoo).

15. Saunders told Kindrick that it is the practice of the agency to discharge probationary employees when a discovery is made they have been dishonest on their employment application. (Ex. 3, Aff. of Kindrick, ¶15; Ex. 9, Aff. of Saunders, ¶7).

16. The email of 8:59 am on December 22, 2014, documents when the decision to terminate Shoals had been made.  (Ex. 9, Aff. of Saunders, ¶7; Ex. 4, Aff. of Gray, ¶¶11-12).

17. Kindrick had decided to wait until after Christmas to inform Ms. Shoals about her discharge "out of kindness."  (Ex. 3, Aff. of Kindrick, ¶18; Ex. 4, Aff. of Gray, ¶11; Ex. 9, Aff. of Saunders, ¶9).

18. A series of emails was exchanged on December 22 and 23, 2014, regarding administrative tasks necessary to process Shoals' termination.  A draft of the discharge letter was circulated, which was originally prepared for Kindrick's signature, but was later updated to Gray's signature. (Ex. 11, Email chain dated December 22, 2014, between Kindrick, Gray, Saunders, Willyard, and McAdoo).

19. At 10:58 am on December 22, 2014, Luke Cooper sent an email to Gray to inform him of an impending OCA Administrative Review concerning referral 1638189 and that he planned to

come to the Muskogee County office to interview several CWS workers, including Shoals. (Ex. 12, Email from Luke Cooper on December 22, 2014).

20. On December 22, 2014, Shoals alleges Heist instructed her to close the R.S. case as soon as possible.  In the process of reviewing the file for closure, Shoals "noticed that there was a case note missing from the investigation file in the KIDS program."  The allegedly missing note was about Shoals' conversation with Christen Westdyke and Jeff Sanders on November 5, 2014. (Ex. 1, Depo. of Shoals, p. 118, ll. 6 - 25).

21. Shoals stated at her deposition that she added the note back into the other (KK case) file on December 22, 2014, as soon as she realized that it had been deleted.  (Ex. 1, Depo. of Shoals, p. 123, ll. 19 - 21).

22. On December 22, 2014, at 1:12 pm, Shoals made an entry in the KIDS database into the "contacts" portion of the "KK case."  The KK case is a method by which referrals associated with R.S or any of his siblings can be linked together.  The entry made by Shoals on December 22, 2014, at 1:12 pm states:

> "Worker spoke with Kristen Westdyke regarding the information I had gathered pertaining to the investigation. Kristen Westdyke advised that she had spoken with Jeff Sanders regarding the results of the investigation, she stated that Jeff Sanders advised that there was not enough evidence to determine that there was a safety threat. Kristen stated that I was to advise the parents that the investigation would continue and I was instructed to return tomorrow for a follow up."

This entry indicates that it was concerning events that occurred on November 5, 2014.  The entry is currently in the database, and has never been deleted.  This is the only entry made by Shoals for this KK case on December 22, 2014. (Ex. 3, Aff. of Kindrick, ¶29; Ex. 6, Screenshot of Case Notes in KIDS database showing entry on December 22, 2014).

23. After Shoals added the entry into the KIDS database on December 22, 2014, she contacted OCCY, OCA, and OIG.  (Ex. 1, Depo. of Shoals, p. 123, ll. 19 - 21, p. 129, ll. 12 - 14).

24. On December 26, 2014, Shoals met with Luke Cooper from OCA as a part the OCA investigation into the Muskogee County DHS office, which included investigation of the R.S. matter. (Ex. 13, Aff. of Cooper, ¶¶11-12). Cooper met with Shoals at the DHS office in Muskogee, where she was employed. OCA Investigator Cooper's meeting with Shoals was part of her work day for that day and it was considered to be part of her job duties. (Ex. 13, Aff. of Cooper, ¶¶11-12).

25. On December 26, 2014, Shoals was terminated for not disclosing her prior state employment to DHS on her application. (Ex. 3, Aff. of Kindrick, ¶20; Ex. 4, Aff. of Gray, ¶14; Ex. 9, Aff. of Saunders, ¶11).

26. Shoals' involvement in the R.S. case had absolutely nothing to do with the discharge decision. Neither Kindrick or Gray nor anyone else believed that Shoals had done anything wrong regarding her handling of the R.S. case. No one ever discussed or remotely entertained any notion whatsoever that Shoals should receive any form of discipline related to her handling of the R.S. case. (Ex. 3, Aff. of Kindrick, ¶21; Ex. 4, Aff. of Gray, ¶13; Ex. 9, Aff. of Saunders, ¶¶12, 13, 14).

27. At the time of the termination decision, Gray was unaware that Shoals had allegedly reported any information regarding the R.S. case to the Multidisciplinary Team (MDT), the Office of Client Advocacy (OCA), the Office of Inspector General (OIG), or the Oklahoma Commission on Children and Youth (OCCY). (Ex. 4, Aff. of Gray, ¶17).

28. At the time of the termination decision, Kindrick was unaware that Shoals had allegedly reported any information regarding the R.S. case to the Office of Client Advocacy (OCA), the Office of Inspector General (OIG), or the Oklahoma Commission on Children and Youth (OCCY). (Ex. 3, Aff. of Kindrick, ¶25).

29. At the time of the termination decision, Saunders was unaware the Shoals was involved in any way with the R.S. case or that she had allegedly reported any information regarding the R.S. case to the Office of Client Advocacy (OCA), the Office of Inspector General (OIG), or the Oklahoma Commission on Children and Youth (OCCY). (Ex. 9, Aff. of Saunders, ¶2).

30. Shoals' communication with the MDT about the R.S. case did not play any role in the decision to terminate her employment. (Ex. 3, Aff. of Kindrick, ¶24; Ex. 4, Aff. of Gray, ¶13, 14; Ex. 9, Aff. of Saunders, ¶¶12, 14).

31. It would be part of Shoals' job duties to communicate with OCA regarding an investigation concerning child abuse in a case that had been assigned to her. It is common for OCA investigations to include interviews of DHS child welfare employees. (Ex. 3, Aff. of Kindrick, ¶26; Ex. 4, Aff. of Gray, ¶17; Ex. 13, Aff. of Cooper, ¶¶3-4).

32. It would be part of Shoals' job duties to communicate with OIG regarding any knowledge which she may have relevant to an investigation being conducted by OIG. (Ex. 3, Aff. of Kindrick, ¶27; Ex. 4, Aff. of Gray, ¶18).

33. It would be part of Shoals' job responsibilities to communicate with OCCY regarding issues related to child abuse or neglect. (Ex. 3, Aff. of Kindrick, ¶28).

34. When OCA conducts an administrative investigation, one of the primary ways it obtains information is by interviewing the DHS child welfare service workers who were directly involved in the case. It is routine for OCA investigations to include interviews of all DHS child welfare workers who participated in the child welfare case being reviewed by OCA. OCA has authority to conduct interviews of CPS and CWS workers as part of an administrative investigation. It is part of the job duties of DHS child welfare employees to cooperate in OCA investigations. (Ex. 13, Aff. of Cooper, ¶¶3-5).

35. Shoals did *not* make the initial report of the R.S. matter to OCA. Shoals contacted OCA and indicated that she wanted to be interviewed as part of the R.S. investigation before December 22, 2014.   Based upon Ms. Shoals' involvement in the R.S. matter, the OCA investigator, Luke Cooper, would have conducted her interview even if she had not made a request to be interviewed.  (Ex. 13, Aff. of Cooper, ¶¶6-7).

36. OCA investigator Cooper did not disclose the contents of his interview of Ms. Shoals with anyone outside of OCA until a much later time, when he had completed his investigation report. (Ex. 13, Aff. of Cooper, ¶13).

37. There was not any "cover up" of the R.S. matter. The concern was reported to OCA very soon after the events occurred and the investigation which OCA conducted was a complete and detailed review of all of the issues.  (Ex. 13, Aff. of Cooper, ¶14).

38. On January 5, 2015, ten days after her termination, Shoals communicated with OIG about the R.S. case and alleged deletions of her case notes. (Ex. 14, General Information for OIG referral #150105006).

39. On January 13, 2015, Kathryn Brewer, the Advocate General and head of the Office of Child Advocacy, sent an email to George Tipton of the Office of Inspector General regarding Shoals' allegations that Heist had deleted her case notes. Brewer states, "The initial oddity in the audit trail has been explained and it does not appear that the records were altered by Heist." (Ex. 15, Email of January 13, 2015, from Kathryn Brewer to George Tipton.).

**Standard for Summary Judgment**

When  public-employee  defendants  assert  the  defense  of  qualified  immunity—as  the individual defendants in this case do—the court uses a different summary judgment standard than is used in other cases.  *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015).  When the

qualified immunity defense is raised in a motion for summary judgment, the onus is on the plaintiff to demonstrate (1) that the official violated a constitutional right, *and* (2) that the right was "clearly established" at the time of the challenged conduct.  *Id.*  In order to survive summary judgment, the plaintiff must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to the party's case."  *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006).  To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.  *Id.*  Unsubstantiated allegations carry no probative weight in summary judgment proceedings.  *Id.*  And, as with any summary-judgment determination, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

**Argument and Authorities**

**I. Kindrick and Gray are entitled to summary judgment on Shoals' claim of First Amendment retaliation.**

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); see also *Pickering v. Bd. Of Educ.*, 391 U.S. 563, 568 (1968). Therefore, "a public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech."  *Dill v. City of Edmond, Okla.*, 155 F.3d 1193, 1201 (10th Cir. 1998) (citing *Connick v. Myers*, 461 U.S. 138, 146-47 (1983)).  *Couch v. Board of Trustees of Memorial Hosp. of Carbon County*, 587 F.3d 1223 (10th Cir. 2009).

When analyzing a free speech claim based on retaliation by an employer, the court should apply the five-prong *Garcetti/Pickering* test:

First, the court must determine whether the employee speaks pursuant to his official duties. If the employee speaks pursuant to his official duties, then there is no constitutional protection because the restriction on speech simply reflects the exercise of employer control over what the employer itself has commissioned or created.

Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court must determine whether the subject of the speech is a matter of public concern. If the speech is not a matter of public concern, then the speech is unprotected and the inquiry ends.

Third, if the employee speaks as a citizen on a matter of public concern, the court must determine whether the employee's interest in commenting on the issue outweighs the interest of the state as employer.

Fourth, assuming the employees' interest outweighs that of the employer, the employee must show that his speech was a substantial factor or a motivating factor in a detrimental employment decision.

Finally, if the employee establishes that his speech was such a factor, the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech. *Brammer-Hoelter*, 492 F.3d at 1202-03 (internal quotations and alterations omitted).

*Couch*, supra, at 1235.

**A. Shoals cannot establish the fourth prong of the *Garcetti/Pickering* test, that her speech regarding the R.S. case was a substantial or motivating factor in the decision to terminate her employment.**

Shoals' involvement with the R.S. case was not considered in any way in the decision to terminate her employment. Shoals' speech to the Multidisciplinary Team, OCA, OIG, and OCCY also was not considered in any way in the decision to terminate her. (Ex. 9, Aff. of Saunders, ¶¶6, 12; Ex. 3, Aff. of Kindrick, ¶¶6, 25; and Ex. 4, Aff. of Gray, ¶¶5, 17).

The primary reason that Shoals was terminated was for making a false statement on her application for employment with DHS.  Her failure to follow supervisory directives, problems getting along with her supervisor, and problems regarding the Muskogee County jail also factored into the decision to terminate her employment.  (Ex. 9, Aff. of Saunders ¶¶11-15; Ex. 3,

11

Aff. of Kindrick, ¶¶15, 17, 21, 24; and Ex. 4, Aff. of Gray, ¶¶12-17). Leanne Saunders, Michael Kindrick, and Zane Gray participated in the decision to terminate Shoals.

**1. Shoals' alleged communications to OCA, OCCY, and OIG regarding safety decisions of R.S were not a motivating factor in her termination.**

The decision to terminate Shoals was made on December 22, 2014, at 8:59 am.[2] (Ex. 11, Email chain between Saunders, Kindrick, and Gray; Ex. 3, Aff. of Kindrick, ¶16, 17; Ex. 4, Aff. of Gray, ¶10; Ex. 9, Aff. of Saunders, ¶12). Shoals did not report her concerns about R.S. to the Office of Client Advocacy (OCA), the Oklahoma Commission on Children and Youth (OCCY), or the Office of the Inspector General (OIG) until after 1:12 pm on December 22, 2014. Shoals stated at her deposition that she discovered alleged deletions of her case notes on December 22, 2014, and that she added the note back into the KIDS database before she called OCA, OCCY, and OIG. (Ex. 1, Depo. of Shoals, p. 118, ll. 6-19 and p. 123, ll. 19-21 and p. 129, ll. 12-14). Shoals added the note into the KIDS database at 1:12 pm on December 22, 2014. (Ex. 6, Screenshot of Case Notes; Ex. 3, Aff. of Kindrick, ¶29). Thus, Shoals' contact with OCA, OCCY, and OIG did not occur until after 1:12 pm on December 22, 2014, which was after the decision to discharge was made at 8:59 am that day.[3] Shoals' communications with OCA, OCCY, and OIG could not have been a motivating factor in her termination when those communications had not yet occurred when the termination decision was made. The decision-makers regarding Shoals' termination could not have been motivated by speech that they were

---

[2] Kindrick and Gray wanted to wait until after Christmas to convey the discharge decision to Shoals out of kindness. (Ex. 3, Aff. of Kindrick, ¶18). Thus, the termination decision was conveyed to Shoals on December 26, 2014.

[3] For purposes of this motion, Defendants accept Shoals' deposition testimony that she contacted OIG on December 22, 2014, after 1:12 pm. However, documents maintained by OIG indicate that Shoals communication with OIG occurred on January 5, 2015, ten days after her termination. (Ex. 14, General Information for OIG referral #150105006).

unaware of because it had not yet occurred. *Meyers v. E. Oklahoma Co. Technology Ctr.*, 776 F.3d 1201, 1206 (10th Cir. 2015).

Further, Saunders and Gray maintain that they had no knowledge that Shoals had allegedly spoken with any of the four offices/commissions at the time the termination decision was made. (Ex. 4, Aff. of Gray, ¶15; Ex. 9, Aff. of Saunders, ¶12).  Saunders, who was located in the Human Resources Department in Oklahoma City, was not even aware that Shoals had any involvement in the R.S. case.  (Ex. 9, Aff. of Saunders, ¶¶12-13).  Again, Shoals' alleged communication cannot be a motivating factor for termination if none of the decision-makers were aware of it. *Meyers*, supra.

Gray had received an email from OCA investigator, Luke Cooper, on December 22, 2014, at 10:58 am stating that he planned to interview Shoals as part of the OCA investigation, but Cooper's email was after the decision to terminate Shoals had already been made.  (Ex. 12, email from Luke Cooper to Zane Gray on December 22, 2014, at 10:58 am).  Further, it is routine for OCA to interview all child protective service workers involved in a case, such as Shoals, as part of an investigation. (Ex. 14, Aff. of Cooper, ¶4).  Cooper's email to Gray regarding his plan to interview Shoals would not have caused Gray to take any action against her.  Indeed, Gray does not recall receiving this routine email giving him courtesy notification of Cooper's intent to interview Shoals.  (Ex. 4, Aff. of Gray, ¶¶10, 13, 17).

Shoals might point to the close time proximity between her interview by OCA investigator Cooper and her discharge as support for her allegation that there is a connection between the two events.  She was interviewed by Cooper on December 26, 2014, and then discharged later that day.  However, Cooper didn't disclose the substance of his meeting with Shoals until a much later point in time when his investigative report was completed.  (Ex. 13,

Aff. of Cooper, ¶13).  Thus, even if the decision to terminate Shoals was made on December 26, 2014, rather than December 22, 2014, Kindrick and Gray didn't know the substance of Shoals' conversation with OCA (Cooper) at the time of her termination, and it could not have been a motivating factor for her termination.  *Meyers,* supra.  There is nothing other than temporal proximity connecting Shoals' discharge with the OCA interview.  "Temporal proximity between the protected speech, without more, does not allow for an inference of a retaliatory motive." *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014).

**2.  Shoals alleged communications regarding alleged deletion of her case notes were not a motivating factor in her termination.**

As explained in section (A)(1) above, Shoals did not become aware of alleged deletions of her case notes until 1:12 pm on December 22, 2014, which was after the decision was made to terminate her at 8:59 am that day.  Thus, she could not have made any communications to anyone, including her direct supervisors and the MDT, until after the discharge decision was made.  Shoals' alleged communications regarding deletion of her case notes cannot be a motivating factor for termination if none of the decision-makers were aware of it. *Meyers*, supra.

**3.  Shoals communications to the Multidisciplinary Team (MDT) regarding safety decisions of R.S were not a motivating factor in her termination.**

Gray was not aware that Shoals had discussed the R.S case with the Multidisciplinary Team (MDT), thus that communication could not have motivated him to terminate her. (Ex. 4, Aff. of Gray, ¶¶14-15). *Meyers*, supra.

Kindrick was aware that Shoals had spoken with the MDT about R.S. during the first week on November, 2014. However, her speech to the MDT did not play any factor in the termination decision. (Ex. 4, Aff. of Gray, ¶¶14-15). It had never occurred to Kindrick or Gray that Shoals had done anything wrong regarding the R.S. case, including her reporting to the

14

MDT, or that there was any reason to consider discipline of Shoals regarding the R.S. case or her communications concerning the case.  (Ex. 3, Aff. of Kindrick, ¶25; Ex. 4, Aff. of Gray, ¶15).

Shoals cannot show that her communications with various offices/commissions motivated the decision to terminate her employment, and thus she cannot meet the fourth prong of the *Garcetti/Pickering* test. Her communication with the MDT was routine, and unknown to Saunders and Gray.  None of the decision-makers regarding her termination were aware of any communications with OCA, OIG, or OCCY at the time the decision to terminate was made, because those communications had not yet occurred. Shoals cannot meet the fourth prong required to prove a First Amendment retaliation claim, and thus Kindrick and Gray should be granted summary judgment.

   **4.  Shoals communications with her direct supervisors regarding safety decisions of R.S. were not a motivating factor in her discharge.**

In a first amendment retaliation claim, Plaintiff must prove her speech was a motivating factor in Defendants' decision to discharge her.  *Maestas v. Segura*, 416 F.3d 1182, 1187 (10th Cir. 2005).  This includes speech directed to supervisors.  Kindrick, Gray and Saunders all state that Shoals speech regarding the R.S. case was not a factor in her discharge.  (Ex. 3, Aff. of Kindrick, ¶24, Ex. 4, Aff. of Gray, ¶14, Ex. 9, Aff. of Saunders, ¶13).  Therefore, no statements made to Shoals' supervisors were a motivating factor in the decision to discharge Shoals. Plaintiff must come forward with some evidence to show communications between Shoals and her supervisors was a substantial motivating factor in her discharge.

**B. Shoals cannot establish the first prong of the *Garcetti/Pickering* test because her speech regarding the R.S. case was pursuant to her official job duties.**

Shoals claims that her termination was motivated by her speech regarding a child welfare case to the Multidisciplinary Taskforce (MDT), the Office of Client Advocacy (OCA), the Office

of Inspector General (OIG), and the Oklahoma Commission on Children and Youth (OCCY). However, her speech to all of these organizations was within her official job duties. *Garcetti* holds that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. The official-duties question is a practical one that turns on whether the speech was commissioned by the employer and reasonably contributes to or facilitates the employee's performance of the official duty. *Seifert v. Unified Gov't of Wyandotte Co.*, 779 F.3d 1141, 1151 (10th Cir. 2015). If the speech is consistent with the type of activities the employee was paid to do, it is made within the scope of employment. *Green v. Bd. of Co. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007).

According to the official Job Description for Ms. Shoals' position as a Child Welfare Specialist, her job duties included:

> • providing child welfare services to children and families;
> • coordinating activities with law enforcement entities;
> • participating in investigations of abuse and neglect of children;
> • providing protective services and coordinating referrals to other units, agencies, service providers and the courts;
> • working with a multidisciplinary team.

(Ex. 2, job description of Child Welfare Specialist).

### 1. The Multidisciplinary Taskforce/Team (MDT)

Multidisciplinary teams are established by Oklahoma Statute. *10A O.S. §1-9-102*. District attorneys are directed to "develop a multidisciplinary child abuse team in each county of the district attorney or in a contiguous group of counties." *10A O.S. §1-9-102(A)*. Multidisciplinary team members include the district attorney, mental and medical health professionals, law enforcement personnel, Child Advocacy Center personnel, and "**child protective services workers within the Department of Human Services**". *10A O.S. §1-9-102(B)* (emphasis

added).  The employment position held by Shoals for DHS is specifically mentioned in statute as a "member" of the Multidisciplinary Team (MDT).  There is no doubt that Shoals was speaking pursuant to her official duties when she attended a meeting of the MDT and spoke to them about a child welfare case which she had encountered in the course of her duties as a child protective services worker with DHS.

Further, Shoals' official "job description" as a Child Welfare Specialist specifically mentions that a necessary skill and ability of her position is to "work with a multidisciplinary team." (Ex. 2, CWS Job Description at ¶ headed "Knowledge, Skills and Abilities").  There can be no better evidence than Shoals' official job description to address the question of whether or not something falls within her job duties. Shoals was speaking to the multidisciplinary child abuse team about a child abuse case as part of her official duties as a Child Welfare Specialist for DHS.  These duties are mentioned in Oklahoma Statutes and in Shoals' job description. She was not speaking as a citizen for First Amendment purposes, and the Constitution does not insulate her communications from employer discipline.  *Garcetti*, 547 U.S. at 421.

### 2.  The Office of Client Advocacy (OCA)

The OCA is an office *within the Department of Human Service* and is also established by statute: "A. 1. The Director of Human Services is authorized and directed to establish the Office of Client Advocacy within the Department of Human Services…" *10A O.S. § 1-9-112*. One of the main purposes of OCA is to investigate allegations of child abuse and neglect.  *10A §1-9-112(A)(3)(d)*.  OCA also has authority to review "any decision or action by an employee or agent of the Department of Human Services." *10A O.S. §1-9-112(A)(3)(c)(1)(b)*.

When OCA conducts a child abuse investigation, one of the primary ways that it obtains information is by interviewing the DHS child protective service (CPS) workers who were

directly involved in the case. OCA has authority to conduct interviews of CPS workers, such as Shoals, and CPS workers are considered to be within the performance of their job duties when the interviews are conducted. (Ex. 13, Aff. of Cooper, ¶¶3, 4). It should be noted that Shoals did not make the report to OCA regarding the R.S. investigation. The initial report had already been made prior to Shoals' involvement with OCA. (Ex. 13, Aff. of Cooper, ¶7). Shoals' involvement was participation in the investigation through an interview with the OCA investigator, a task which he would have performed without any contact being made by Shoals with OCA. (Ex. 13, Aff. of Cooper, ¶9). Shoals' job description states that part of her job duties are to participate in investigations of child abuse and neglect and to coordinate referrals to other units. (Ex. 2, job description). When Shoals spoke with Luke Cooper of OCA, she provided him with information to assist with his investigation of a child abuse case and his review of the decisions or actions of employees of DHS. She provided him with information which she knew based upon her direct involvement in a child welfare case. Shoals and Cooper were both employees of DHS and both were fulfilling the express requirements of their jobs for DHS. Shoals was not speaking as a citizen for First Amendment purposes, and the Constitution does not insulate her communications from employer discipline. *Garcetti*, 547 U.S. at 421.

### 3. The Oklahoma Commission on Children and Youth (OCCY)

As discussed above, Shoals' job duties included working with the MDT. OCCY shares responsibility with the district attorney for developing the MDT: "A. 1. In coordination with the Oklahoma Commission on Children and Youth, each district attorney shall develop a multidisciplinary team…" *10A O.S. §1-9-102*. Thus, Shoals' job duties regarding the MDT are also necessarily inclusive of OCCY.

There are many other relationships between several of the entities who received communications from Ms. Shoals:

- OCCY and the district attorney develop the MDT; *10A O.S. § 1-9-102(A)*
- CPS workers within DHS are members of the MDT; *10A O.S. § 1-9-102(B)(4)*
- OCA makes reports to OJSO[4]; *10A O.S. § 1-9-112*
- OCA works with OJSO; *10 O.S. § 601.6*
- OJSO is an office within OCCY; *10 O.S. § 601.3*

The interrelationships between these entities demonstrate that a report to one of them becomes a report to all of them. It is the intent of the legislature to create a system whereby information known by child welfare workers is shared with MDT and OCCY and OCA.  It is clearly part of Shoals' job duties to work with the MDT and to coordinate referrals to other units and agencies, including OOCY.  (Ex. 2, CWS Job Description).  Shoals was not speaking as a citizen for First Amendment purposes, and the Constitution does not insulate her communications from employer discipline.  *Garcetti*, 547 U.S. at 421.

### 4.  The Office of Inspector General (OIG)[5]

OIG is a division/unit of the Department of Human Services.  "OIG is responsible for addressing complaints of fraud, misconduct, or criminal behavior against current Oklahoma Department of Human Services (DHS) employees."  *OKDHS:2-7-1*.  Shoals' job description states that part of her job duties are to coordinate referrals to other units.  It was part of Shoals' job duties to communicate with OIG regarding any knowledge which she may have relevant to an investigation being conducted by OIG.  (Ex. 3, Aff. of Kindrick, ¶27; Ex. 4, Aff. of Gray, ¶).

---

[4] Office of Juvenile System Oversight
[5] Shoals' Second Amended Complaint mentions "the Oklahoma Inspector General's Office" as one of the entities that she spoke to.  (Doc. #44, at ¶23).  Defendants believe that she is referring to the Office of Inspector General, which is a division of DHS.

### 5. Shoals direct supervisors and chain of command

Plaintiff alleges in ¶16 of the Second Amended Complaint (Doc. #44), that she described the actions of the night of November 5, 2014, and the decision to leave the child, R.S., in the residence, to her Child Protective Services supervisor, Summer Purdom.  In ¶21, Plaintiff alleges that she informed Michael Kindrick of how the situation with R.S. was handled, that it was wrong to leave R.S. in the home and that doing so violated DHS policy.  Any reports that Plaintiff made to Purdom or Kindrick, or anyone else in her chain of command about the "R.S. situation," were not constitutionally protected speech as those comments were made pursuant to her official duties.  Shoals' communications with her direct supervisors did not include any information regarding alleged deletions of her case notes, because she was not aware of the alleged deletions until after the termination decision was made.  The content of Shoals' speech with her supervisors was strictly about the safety decisions concerning R.S. As a child welfare specialist, discussions concerning the welfare/safety of a child on her case load fall squarely within Shoals' job duties.

In *Thomas v. City of Blanchard*, 549 F.3d 1317 (10th Cir. 2008), the Tenth Circuit cited *Brammer-Hoelter*, 492 F.3d 1192 (10th Cir. 2007) in saying "that if speech 'reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties. [*Brammer-Hoelter*, 492 F.3d at 1203]."  In *Thomas*, the Court further relied on its decision in *Casey v. W. Las Vegas Independent School District*, 473 F.3d 1323 (10th Cir. 2007), to draw a distinction between speech made to someone in the employee's chain of command.

> It was when Casey went beyond her supervisors and reported to someone outside her chain of command about a matter which was not committed to her care that we found that her speech was protected by the First Amendment. *Id.*  So too, when Mr. Thomas went beyond complaining to his supervisors and instead

> threatened to report to the OSBI, an agency outside his chain of command, his speech ceased to be merely 'pursuant to his official duties' and became the speech of a concerned citizen. (footnote omitted).

*Thomas*, 548 F.3d at 1325.   The safety of the child, R.S., was a matter committed to Plaintiff's care, and Plaintiff's discussion with supervisors in her chain of command about the wisdom of a safety decision made regarding R.S. would have been pursuant to Plaintiff's official duties.

**C. Kindrick and Gray can establish the fifth prong of the *Garcetti/Pickering* test, the same action would have been taken against Shoals even in the absence of the protected speech.**

If the employee can establish the first four prongs of the *Garcetti/Pickering* test, then the employer can demonstrate that it would have taken the same action even in the absence of the protected speech.   *Couch*, supra, at 1235.   In sections I(A) and I(B), above, Kindrick and Gray have demonstrated that Shoals cannot establish prongs one and four of the *Garcetti/Pickering* test.   However, in the event that the Court determines that Shoals has established all four prongs, then Kindrick and Gray submit that they can establish the fifth prong – that the same action would have been taken even in the absence of the protected speech.

Leanne Saunders, discipline manager for DHS located in the Human Resources Department in Oklahoma City, made the recommendation to terminate Shoals based upon a false statement on her employment application without knowing anything about Shoals' involvement in the R.S. child welfare matter and without knowing that Shoals had spoken to the Multidisciplinary Taskforce (MDT).   (Ex. 9, Aff. of Saunders, ¶¶11-12). Thus, Saunders' recommendation was "in the absence of (knowledge of) the protected speech".   As the discipline manager, Saunders was in a unique position to know that DHS always seeks termination when it discovers that a probationary employee has been untruthful on his/her employment application. (Ex. 9, Aff. of Saunders, ¶7).   It is the agency practice to terminate all employees in the same

21

circumstances as Shoals.  Saunders recommendation would have been the same even if she had been aware of Shoals alleged communication with the MDT.

Shoals did not communicate with the Office of Client Advocacy (OCA) or the Oklahoma Inspector General (OIG) or the Oklahoma Commission on Children and Youth (OCCY) until after the decision was made to terminate her on December 22, 2014, and thus the action taken actually was in the absence of those communications, since they had not yet occurred.  Thus, the decision to terminate was clearly made in the absence of this knowledge.

The decision to terminate Shoals would have been made in the absence of the protected speech.  Since Kindrick and Gray can establish the fifth prong of the *Garcetti/Pickering* test, they are entitled to summary judgment in their favor.

**II. Defendants Gray and Kindrick are entitled to qualified immunity because under the facts and circumstances of this case, extant case law at the time of the firing had not rendered it "beyond debate" that Plaintiff's firing was unlawful.**

In order to overcome the defense of qualified immunity, a plaintiff must show that the defendant violated a "clearly established" right. *White v. Pauly*, 137 S.Ct. 548, 551 (2017); *Lane v. Franks*, 134 S.Ct. 2369, 2381 (2014).   A right is not clearly established unless existing precedents has placed the existence of the right "beyond debate."  *White*, 137 S.Ct. at 551; *Lane*, 134 S.Ct. at 2383.   A clearly established right is one that is sufficiently clear that "every reasonable official would have understood that what he is doing violates that right."  *Aldaba v. Pickens (Aldaba II)*, 844 F.3d 870, 877 (10th Cir. 2016). Clearly established law cannot be defined at a high level of generality.  *White*, 137 S.Ct. at 552. Rather, clearly established law must be "particularized to the facts of the case."  *Id.* (internal quotation marks omitted). Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.  *Id.*  In

order to defeat qualified immunity, the plaintiff must identify a case where a defendant acting under similar circumstances was held to have violated the constitution such that the applicability of the case to the situation under review is beyond debate. *Id.* In this way, qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. *Lane*, 134 S.Ct. at 2381. Qualified immunity applies to wrongful termination cases such as this, in which government officials are named as defendants in their individual capacities. *Id.*; *Seifert v. Unified Gov't of Wyandotte Co.*, 779 F.3d 1141 (10th Cir. 2015). In such cases, the question becomes, could the defendant have reasonably believed that firing the plaintiff was lawful under the circumstances existing at the time of firing? *Lane*, 134 S.Ct. at 2381. Unless it was "beyond debate" that the firing violated the Constitution, the defendant is entitled to qualified immunity. *Lane*, 134 S.Ct. at 2383. In the instant case, the defendants are entitled to qualified immunity because the genuine material facts the plaintiff will be able to show do not establish "beyond debate" the requisite showing under prongs one, four, or five of the *Garcetti/Pickering* test.

First, at the time of Plaintiff's firing, there were no cases holding that a defendant violates the First Amendment when firing an employee for reasons unrelated to the employee's speech. Even if the defendant knew of the plaintiff's speech, there are no cases holding that mere knowledge of protected speech renders an employee incapable of being fired for other non-speech-related reasons. As such, it was not clearly established that Plaintiff's firing was unconstitutional under these circumstances. Second, even assuming, for purposes of argument only, that Plaintiff was fired for the alleged comments she made, it was not clearly established that she made these comments as a citizen rather than as an employee. Defendants could reasonably have believed that extant caselaw suggested Plaintiff's speech was made as an

employee rather than as a citizen.  *See, e.g., Holub v. Gdowski*, 802 F.3d 1149 (10th Cir. 2015) (school district employee's comments to school board relaying accusations of unlawful budgeting practices by the district were made as employee, not as citizen); *Mpoy v. Rhee*, 758 F.3d 285 (11th Cir. 2014) (email sent by special education teacher to chancellor of school district reporting that school principal had falsified student records was employee speech unprotected by the First Amendment, rather than citizen speech).  Even if this Court finds that Plaintiff's speech was made as a citizen rather than as an employee, the state of the law at the time the firing had not rendered this finding "beyond debate."  Thus, defendants Gray and Kindrick are entitled to qualified immunity.

For the reasons argued above in sections I(A), I(B), and I(C), Shoals cannot establish that Kindrick or Gray have violated her constitutional rights.  There is a presumption in favor of immunity for public officials acting in their individual capacities.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Further, qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  It is clear that Kindrick and Gray are entitled to qualified immunity from personal liability in their individual capacities for Shoals' §1983 claims alleged against them in the Fifth claim of the Complaint.

**Conclusion**

Because there was neither a violation of Plaintiff's constitutional rights nor a violation of Plaintiff's "clearly established" constitutional rights, Defendants Kendrick and Gray respectfully request that the Court enter summary judgment in their favor.

Respectfully submitted,


*s/Anastasia S. Pederson* _____
Anastasia S. Pederson (OBA #17118)
John E. Douglas (OBA #2447)
Assistant General Counsel
Department of Human Services
P.O. Box 25352
Oklahoma City, OK 73125-0352

Telephone:  (405) 521-3638
Facsimile:  (405) 521-6816

E-mail:  John.Douglas@okdhs.org
E-mail:  stacy.pederson@okdhs.org

*Attorneys for Defendants*
*Zane Gray and Michael Kindrick*


## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of March, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant:

Charles C. Vaught
*Attorney for Plaintiff*


*s/ Anastasia S. Pederson* _____
Anastasia S. Pederson

25